**CARGILL, Inc. v. COMMODITY EX-
CHANGE COMMISSION et al.**

Civ. 2362–51.

United States District Court
District of Columbia.

April 8, 1952.

Weston B. Grimes, Washington, D. C., Leo F. Tierney, Chicago, Ill., James E. Dorsey, Minneapolis, Minn., for plaintiff.

Charles M. Irelan, U. S. Atty., Ross O'Donoghue, Asst. U. S. Atty., Washington, D. C., for defendants.

MORRIS, Judge.

The plaintiff is a warehouseman, licensed under the United States Warehouse Act, 7 U.S.C.A. § 241 et seq., to operate a warehouse within the meaning of that Act at Chicago, Illinois, and other places not here relevant. Warehouse receipts for grain stored in said warehouse are accepted in satisfaction of grain futures contracts made on or subject to the rules of the Board of Trade of the City of Chicago. The defendant Commodity Exchange Commission is an agency established by the Commodity Exchange Act, 7 U.S.C.A. § 1 et seq., to carry out certain rule making and adjudicative functions under said Act, the individual defendants being members of said Commission. The Board of Trade of the City of

Chicago is a "contract market," so designated by the Secretary of Agriculture under the Commodity Exchange Act. The plaintiff is not a member of the Board of Trade.

In May 1949 the Board of Trade adopted amended rules and regulations which require all persons who operate warehouses licensed under the United States Warehouse Act in the Chicago area to file a formal application with the Board of Trade, to have each such warehouse declared to be "regular," if the warehouse receipts thereof were to be acceptable in satisfaction of grain futures contracts made on the Board of Trade, and which require such warehouses and warehousemen to agree to submit to certain regulations by the Board of Trade. The plaintiff objected to such amended rules upon the ground that they were beyond the authority of the Board of Trade under Section 5a(7) of the Commodity Exchange Act, 7 U.S.C.A. § 7a(7), and in contravention of the United States Warehouse Act, and plaintiff refused and still refuses to submit thereto, or to file an application to have its warehouse declared "regular," as required by said amended rules and regulations. The Board of Trade insisted that it had authority to issue the amended rules and regulations by reason of the powers granted to contract markets by Section 5a(7) of the Commodity Exchange Act. Thereupon the plaintiff, on August 31, 1950, filed a petition with the Administrator of the Commodity Exchange Authority, United States Department of Agriculture, Washington, D. C., stating in substance that the jurisdiction and authority of the Secretary of Agriculture is exclusive with respect to warehouses and warehousemen licensed under the United States Warehouse Act, except for the grant of authority to contract markets under Section 5a(7) of the Commodity Exchange Act to impose certain limited requirements on such warehouses, and that consequently the amended rules and regulations of the Board of Trade could not lawfully be imposed on warehousemen and warehouses licensed under the United States Warehouse Act. Plaintiff requested the Administrator to institute proceedings before the Commodity Exchange Commission for a declaratory order, as authorized by the Administrative Procedure Act, construing Section 5a(7) of the Commodity Exchange Act to prohibit any exercise "by any contract market, of any jurisdiction over warehouses or warehousemen licensed under the United States Warehouse Act, or over any matters pertaining to their conduct or operation of their warehouse business or activities, except, * * * to impose on said warehouses such reasonable requirements as may be imposed by a contract market on other warehouses as to the location, accessibility, and physical suitability of the warehouse for warehousing purposes and for the purpose of the physical delivery of grain out of the warehouse." On September 1, 1950, the Administrator of the Commodity Exchange Authority referred plaintiff's petition to the Commodity Exchange Commission for appropriate action. On September 15, 1950, the Board of Trade filed with the Secretary of Agriculture a detailed analysis of its amended rules and regulations, and requested the Secretary of Agriculture, as Administrator of the Commodity Exchange Act and the United States Warehouse Act, to issue revised regulations pursuant to his rule making powers thereunder, giving effect to the matters covered by the amended rules and regulations of the Board of Trade. The Board of Trade did not request that its action in adopting its amended rules and regulations be approved, but stated that, if the Secretary of Agriculture acceded to the request to issue the regulations as his own, the Board of Trade would make all necessary changes in its rules and regulations to conform to those issued by the Secretary of Agriculture. The Board of Trade, by communication dated September 15, 1950, to the Administrator of the Commodity Exchange Authority, asked that its letter of the same date to the Secretary of Agriculture be treated as an answer to the petition filed by the plaintiff with the Administrator on August 31, 1950. Counsel for plaintiff, in a communication to the Secretary of Agriculture, asked for a public hearing before any action was taken on the regulations proposed by the Board of Trade. This request was not granted. On December 14,

1950, the Commodity Exchange Commission rendered a decision, holding that all of the amended rules and regulations of the Board of Trade could be validly adopted and promulgated by the Board of Trade pursuant to the authority granted to a contract market by Section 5a(7) of the Commodity Exchange Act, except the regulation relating to arbitration, which the Commission held to be beyond the power of the Board of Trade, because it would compel the operator of a warehouse licensed under the United States Warehouse Act who was not a member of the Board of Trade to submit any dispute which he had with a member of the Board of Trade for final determination by a committee of members of the Board of Trade. This procedure, the Commission held, would violate the basic principle of arbitration by an impartial arbitrator, and would be unreasonable and discriminatory.

On January 12, 1951, the plaintiff petitioned the Commission to reconsider and modify its decision, again asking for a hearing. On May 11, 1951, the Commission, without further hearing, rendered a final decision, stating that plaintiff's petition presented no new issue of a substantial nature and was, therefore denied. The effective date of the amended rules and regulations, revised in accordance with the Commission's decision, has been postponed from time to time, and it was asserted at the hearing, and not controverted, that, pending a determination of this controversy, the Board of Trade has been enjoined in an action in the District Court for the Northern District of Illinois from enforcing said amended rules and regulations with respect to this plaintiff. It is thus apparent that there is an actual controversy between the plaintiff and the Commodity Exchange Commission as to the powers of the Board of Trade under the provisions of Section 5a(7) of the Commodity Exchange Act and the legality of the decision made by that Commission, which gives jurisdiction to this Court, under the provisions of Section 10 of the Administrative Procedure Act, 5 U.S. C.A. § 1009, to review the said decision of the Commission, and to render a declaratory judgment with respect thereto.

In the decision of the Commission, it is stated that the issue is confined to whether or not the nine rules set forth in the Board of Trade's letter of September 15, 1950, constitute a proper exercise of authority by the Board of Trade:

"The rules which the Board of Trade seeks to make effective would require that any warehouse or its operator, as a condition of regularity, (1) furnish live transit billing to holders of receipts, (2) make insurance available to such holders, (3) safeguard the condition of grain in warehouses by removing grain which has deteriorated, (4) notify the public of damage to grain stored, (5) pay for any deficiency and receive payment for any excess between the quantity of grain delivered and the quantity called for by the warehouse receipts, (6) furnish a bond, (7) fill orders for loading grain into and out of the warehouse in chronological priority and keep records of such orders, (8) submit to an arbitration committee of the Board of Trade any dispute arising out of the delivery of grain, and (9) file an application with the Board for a declaration of regularity."

The Commission pointed out that Cargill contends that the authority of the Board of Trade to impose non-discriminatory requirements on federally licensed warehouses is confined to those matters specified in the proviso, Section 5a(7), Commodity Exchange Act, while the Board of Trade contends that it has authority beyond such matters. The Commission then stated:

"It is not necessary to resolve these conflicting contentions because, even if we assume that Cargill's interpretation is correct, it is the view of the Commission that, with the exception of the arbitration provision, the rules and regulations in question fall within the category specified in the proviso. The 'delivery purposes' of which the proviso speaks are not concerned merely with the physical delivery of grain out of a warehouse, but with delivery for a specific and highly specialized purpose—the satisfaction of a fu-

tures contract. The suitability of a warehouse for the delivery of commodities in satisfaction of futures contracts cannot be determined unless consideration is given not only to the physical structure, but also to the conditions under which the delivery takes place. * * *

"Since conditions under which delivery is made are substantially under the control of the warehouseman, we cannot agree that the term 'suitability' refers solely to the physical suitability of the facility and has no application to the warehouseman as distinguished from the warehouse. The obvious method of reaching or enforcing any requirement pertaining to the warehouse is through its operator. The suitability of the warehouse would, in many respects, turn upon action taken by the warehouseman. We cannot say that such matters as live transit billing, financial responsibility, the removal of damaged grain, the right to chronological treatment of orders, the keeping of proper records, etc., are unrelated to the suitability of the warehouse for delivery purposes with respect to futures contracts, even though such matters are directed primarily to the warehouse operator. It is our conclusion that it is impractical and unrealistic to interpret suitability for delivery purposes in connection with futures contracts as relating solely to physical facilities, and that section 5a(7) does not require such an interpretation."

The Commission discussed the regulations in question with respect to their reasonableness and non-discriminatory character, and determined that they were reasonable and non-discriminatory. Disposition of the regulation respecting arbitration was made as heretofore indicated. The Commission concluded "the views expressed herein should not be interpreted as indicating that the Chicago Board of Trade may adopt any rule or enforce any rule in a manner that would conflict with the Commodity Exchange Act or the United States Warehouse Act, or the regulations thereunder."

After the complaint had been filed in this action a motion to dismiss was made by the defendants upon the ground that the Court lacked jurisdiction, and upon the further ground that the complaint failed to state a cause of action upon which relief could be granted. Upon hearing, this motion to dismiss was overruled by the Court, acting through Judge Letts. Subsequent to the answer of the defendants, the plaintiff filed a motion to strike certain of the defenses and for summary judgment. Thereafter the defendants filed a motion for summary judgment. A hearing was had upon these motions, and affidavits submitted in connection therewith, briefs having been submitted by all parties previous to the hearing.

Section 5a(7) of the Commodity Exchange Act reads as follows:

"Sec. 5a. Each contract market shall—
* * * * * *

"(7) Require that receipts issued under the United States Warehouse Act (U.S.C., 1934 ed., title 7, secs. 241–273) shall be accepted in satisfaction of any futures contract, made on or subject to the rules of such contract market, without discrimination and notwithstanding that the warehouseman issuing such receipts is not also licensed as a warehouseman under the laws of any State or enjoys other or different privileges than under State law: *Provided, however,* That such receipts shall be for the kind, quality, and quantity of commodity specified in such contract and that the warehouse in which the commodity is stored meets such reasonable requirements as may be imposed by such contract market on other warehouses as to location, accessibility, and suitability for warehousing and delivery purposes."

As is quite evident from what has been stated, this entire controversy turns upon the meaning which the Congress intended by the use of the words "suitability for warehousing and delivery purposes" in the proviso of the quoted section. Inasmuch as certain of the critical words used in the

section have direct relation to the United States Warehouse Act, it is important to see how such terms are defined by the Congress in that Act:

"Sec. 2. That the term 'warehouse' as used in this Act shall be deemed to mean every building, structure, or other protected inclosure in which any agricultural product is or may be stored for interstate or foreign commerce, * * *. As used in this Act, 'person' includes a corporation or partnership * * *; 'warehouseman' means a person lawfully engaged in the business of storing agricultural products; and 'receipt' means a warehouse receipt."

The section here under consideration was enacted by the Congress, on June 15, 1936, as part of the Commodity Exchange Act, which amended the Grain Futures Act of September 21, 1922.

The United States Warehouse Act, as originally enacted in 1916, made federal regulation in this field subservient to state regulation. It provided in Section 29 that "nothing in this act shall be construed to conflict with, or to authorize any conflict with, or in any way to impair or limit the effect or operation of the laws of any State relating to warehouses, warehousemen * * *," and Section 6 required an applicant for a federal warehouse license to provide a bond "to secure the faithful performance of [its] obligations as a warehouseman" under state as well as federal law. In 1931 Congress amended the Act. Section 29 was amended to provide that, although the Secretary of Agriculture "is authorized to cooperate with State officials charged with the enforcement of State laws relating to warehouses, warehousemen" and their personnel, "the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this act shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect." Section 6 was amended to omit the requirement that the bond be conditioned on compliance with requirements of state law.[1]

The background and history of this legislative change is discussed in the majority opinion in Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447, and the inescapable conclusion is reached that, while a warehouseman need not operate under the Act, if he chose to be licensed under it, he would then be authorized to operate without regard to state acts and be solely responsible to the federal act. Warehousemen having made their choice to operate under state or federal law should "then be permitted to operate without interference on the part of any agency", and so, with respect to any matter comprehended within the reach of federal regulatory power, no other authority was empowered to act.

The Commodity Exchange Act undertook to impose certain regulations respecting sales and contracts for future sales of certain commodities, including grain, moving, or being intended to move, in interstate or foreign commerce. It provided, among other things, that exchanges, boards of trade or other institutions engaged in the conduct of such sales or contracts for future sales should be designated by the Secretary of Agriculture as "contract markets," and that they should be subject to certain rules and regulations promulgated by the Secretary of Agriculture. The Commodity Exchange Commission, consisting of the Secretary of Agriculture, the Secretary of Commerce and the Attorney General, was established to perform certain adjudicative and disciplinary duties in connection with the Act. As pointed out in Rice v. Chicago Board of Trade, 331 U.S. 247, 67 S.Ct. 1160, 91 L.Ed. 1468, it was not the intention of Congress, by the Commodity Exchange Act, to establish federal authority over such contract markets to the exclusion of any other authority, as was the case in respect of warehouses licensed under the United States Warehouse Act, but that it was the intention of the Congress to permit state authority to be exercised in any respect in which it was not in conflict with the Commodity Exchange

1. The foregoing statement appears in Rice v. Santa Fe Elevator Corp., 331 U.S. 218, at pages 222–224, 67 S.Ct. at pages 1148–1149.

Act, or regulations promulgated thereunder. As one of the means by which the Congress sought to further the objects of the United States Warehouse Act, and at the same time not make unreasonable requirements of a contract market, Section 5a(7) required such contract market to accept receipts from warehouses licensed under the United States Warehouse Act in satisfaction of any futures contract made on or subject to the rules of such contract market. It provided, however, that such warehouse receipt "shall be for the kind, quality, and quantity of commodity specified in such contract", and further provided that the *warehouse* in which the commodity is stored "meet such reasonable requirements as may be imposed by such contract market on other *warehouses* as to *location, accessibility, and suitability for warehousing and delivery purposes.*" (Emphasis supplied.)

██ Unquestionably this proviso gave to the contract market the right to impose such reasonable requirements with respect to location, accessibility and suitability for warehousing and delivery purposes of the federally licensed warehouse, which otherwise the contract market would not have the right to impose. One cannot read the discussions in the Hearings before the Committee on Agriculture and Forestry of the United States Senate, 74th Congress, 2d Session, on H.R. 6772, with reference to the proposed section, and also what was said on the floor of the Senate when it was adopted, without coming to the conclusion that there was no intention whatsoever to impair the principle of exclusive control by the federal authority of the *operation* of federally licensed warehouses. In the light of the controversy that had aroused bitter and widespread conflict of views, it is simply inconceivable that, by the use of the term that the "warehouse" meet "reasonable requirements * * * as to * * * suitability for warehousing and delivery purposes" in the context where every other expression has to do only with the physical commodity named in the receipt and obviously the physical situation of the warehouse as to "location" and "accessibility,"

the Congress intended to hand back any control over the *warehousemen* or the *operation of the warehouses,* and thus establish a duality of control which the Congress had expressly abolished. Precisely what was obviously meant what that a reasonable requirement could be made respecting the facilities and equipment of the warehouse to unload, store and deliver the commodity, such as Regulation No. 1626 of the Chicago Board of Trade referred to in Note 3, at pages 252 and 253 of 331 U.S. and page 1163 of 67 S.Ct., in Rice v. Chicago Board of Trade, supra, that the warehouses must be "provided with modern improvements and appliances for the convenient and expeditious receiving, handling, and shipping of grain in bulk." That this was the accepted intention of the Congress is clearly inferable from the Report of the Federal Trade Commission on the Economic Effects of Grain Exchange Actions Affecting Futures Trading During the First Six Months of 1946, and issued February 4, 1947, prepared at the request of and submitted to the Committee on Agriculture and Forestry, in which it is stated on page 10:

> "Neither does the Commodity Exchange Act relate the administration of the Warehouse Act to exchange operations except to make receipts of federally licensed warehouses tenderable on futures contracts provided such receipts are for the kind, quality and quantity specified in futures contracts, and the warehouse itself *meets the physical requirements* as to location, accessibility, and suitability for warehousing and delivery set up by the exchange for regular warehouses. (Emphasis supplied.)

Doubtless no agency of the federal government has had more familiarity with the legislation on this subject than the Federal Trade Commission, which has made numerous investigations and reports in this field at the direction of and for the Committees of the Congress.

To give the interpretation which the Commission did to the expression used in

the proviso would subject a federally licensed warehouseman to plenary control by the contract market so long as such controls were deemed reasonable, non-discriminatory, and not in conflict with regulations promulgated by the Secretary of Agriculture. That would be obviously contrary to the intent and language of the United States Warehouse Act, and such meaning is not lightly to be attributed to an expression of the Congress in the Commodity Exchange Act when, if such had been the intention, Congress surely could and would have used unmistakable language to that effect.

It is hardly to be doubted that certain of the challenged regulations of the Chicago Board of Trade are reasonable and desirable, particularly that one dealing with live transit billing, but, if such regulations are reasonable and desirable, the plaintiff can easily be made subject to them if promulgated and adopted by the Secretary of Agriculture. Indeed this was the action apparently sought originally by the Chicago Board of Trade. But equally clearly a regulation which requires the plaintiff to make application to the Chicago Board of Trade for a determination of "regularity," which binds the plaintiff as applicant to agree to conform to rules and regulations of the Chicago Board of Trade is neither reasonable nor in conformity with the intention of the Congress as expressed either in the United States Warehouse Act or the Commodity Exchange Act.

In overruling the motion to dismiss the complaint, filed by the defendants herein, on the ground that said complaint did not state a cause of action, this Court must necessarily have reached substantially the same conclusions herein expressed; otherwise the complaint would not have stated a cause of action.

My conclusion is that the decision of the Commission is not in accordance with law and must be vacated. Motion of the plaintiff for summary judgment is granted. Counsel will prepare and submit an appropriate order to carry this decision into effect.