**GREATER BATON ROUGE PORT COMMISSION, and Cargill, Incorporated, Petitioners,**

v.

**UNITED STATES of America, and Federal Maritime Board, Respondents.**

No. 18006.

United States Court of Appeals
Fifth Circuit.

Feb. 7, 1961.

Weston B. Grimes, Carey & Grimes, Washington, D. C. and Samuel D. Timmons, Minneapolis, Minn., for appellant Cargill, Inc.

George Mathews, Hynes, Mathews & Lane, Baton Rouge, La., for appellant Greater Baton Rouge Port Commission.

Edward Aptaker, Robert B. Hood, Jr., Attys., Robert E. Mitchell, Asst. Gen. Counsel, Federal Maritime Board, Washington, D. C., Richard A. Solomon, Atty., Dept. of Justice, Washington, D. C., Robert A. Bicks, Acting Asst. Atty. Gen., (E. Robert Seaver, Gen. Counsel, Federal Maritime Board, of counsel), for appellees.

Walter Carroll, Edward S. Bagley, New Orleans, La., Terriberry, Rault, Carroll,

Martinez & Yancey, New Orleans, La., of counsel, for intervenor.

Before TUTTLE, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Cargill, Inc., is a large grainhandling company. It has an exclusive right to operate a public grain elevator within the Greater Baton Rouge port area by virtue of an agreement with the Baton Rouge Port Commission. The dispute generating this litigation began when Cargill attempted, by amendment to the agreement, to control *all* the stevedoring business at the elevator. Petitioners pose jurisdictional problems under the Shipping Act, 46 U.S.C.A. § 801 et seq., and question the validity of a Report and Order of the Federal Maritime Board.[1] This order, under authority of Section 17 of the Shipping Act empowering the Board to enjoin unjustly discriminatory rates, approves the original agreement between Cargill and the Port Commission. The order disapproves the amendment authorizing the restrictive arrangement creating a monopoly over stevedoring activities at the elevator.

## I.

Baton Rouge Port Commission, one of the petitioners, is a regulatory agency of the State of Louisiana.[2] Cargill, the other petitioner, is a Delaware corporation engaged throughout the country in the business of buying and selling, loading and unloading, storing and delivering grain.

In 1955 the Port Commission leased to Cargill a grain elevator and wharf on the Mississippi River one mile south of Port Allen, Louisiana, within the Greater Baton Rouge port area. This lease, Agreement 8225, gives Cargill the exclusive right to operate a public grain elevator within the port area, and a first option on additional grain storage and handling facilities if the Port Commis-

sion should decide to construct any more such facilities. Article 10 of this agreement, a key provision, states that the grain elevator and wharf shall be maintained as public port facilities; that "to the extent economically feasible [Cargill] will give preference to this grain elevator over the other grain elevators operated by [Cargill] in the Gulf area"; and, that Cargill's rates shall be on a competitive basis with published rates at New Orleans and other Gulf ports.

In 1957 the parties amended their original lease by requiring Cargill to furnish stevedoring service for vessels calling at the grain elevator, and allowing Cargill to condition the loading and unloading of vessels on their using Cargill's stevedoring service exclusively. This amendment is Agreement 8225–1.

The original lease agreement was not filed with the Board for approval. After the lease was amended, Cargill and the Port Commission on April 25, 1957, filed both agreements, 8225 and 8225–1, with the Board for approval under Section 15 of the Shipping Act.

Cargill is licensed under the United States Warehouse Act, 7 U.S.C.A. § 241 et seq., to operate the grain elevator, and has filed copies of the agreements, 8225 and 8225–1, and a schedule of charges with the Secretary of Agriculture. On this peg Cargill hangs its jurisdictional argument.

We note that Cargill's wharf extends over the Mississippi River, and a long ramp runs, on land, from the wharf to the elevator. The license issued by the Secretary of Agriculture covers the elevator only and makes no reference to the wharf, or, for that matter, to any maritime facilities.

The grain elevator was opened in September, 1955, greatly expanding the facilities of the port of Baton Rouge. Four Gulf stevedoring firms, encouraged by the Port Commission and assured by Cargill that the elevator would not be operated on an exclusive basis but would be open to

---

1. Under the Review Act of 1950, 5 U.S. C.A. § 1031 et seq.

2. Louisiana Constitution of 1921, Art. VI, Section 29, LSA–Const.

all stevedores, organized the Baton Rouge Marine Contractors, Inc., (BARMA) to supply agency and stevedoring services at Baton Rouge. The four firms decided to make this a cooperative effort mainly because of the substantial capital investment required for equipment necessary to engage in stevedoring operations at the grain elevator. In the beginning, BARMA ran into trouble in the purchase of equipment and in the hiring and training of personnel and labor. These troubles were overcome and efficiency improved. By the time of the hearing, BARMA's stevedoring rates were only slightly higher than stevedoring rates charged in New Orleans. Cargill was not satisfied. From time to time, Cargill complained to BARMA regarding vessel dispatch and turnaround time. Then in August 1956 Cargill decided to enter into the stevedoring business at Baton Rouge. It brought into the area Rogers Terminal and Shipping Corporation, a wholly-owned subsidiary. Cargill notified BARMA that it was no longer welcome at the elevator and that all vessels calling at the elevator would have to employ Rogers as stevedore. BARMA refused to withdraw from the stevedoring business at the elevator. It has continued to operate in competition with Rogers.

In March 1957, with no notice to BARMA and with no inquiry into how Cargill would conduct the stevedoring operation, the Port Commission entered into an exclusive stevedoring arrangement with Cargill embodied in Agreement 8225–1. The reason stated in the Agreement for this action was to integrate the unloading of vessels "into the over-all elevator operation so as to provide a more efficient service." The Board found, however, that BARMA was more efficient than Rogers, notwithstanding the fact that when Rogers started in business it succeeded in hiring some of BARMA's key supervisory personnel. In the proceedings before the Board BARMA filed a protest against the amendment to the Cargill Agreement. In the instant case BARMA intervened.

## II.

The Port Commission concedes it is subject to the provisions of the Shipping Act and to the jurisdiction of the Federal Maritime Board. State of California v. United States, 1944, 320 U.S. 577, 585, 64 S.Ct. 352, 88 L.Ed. 322. Cargill, relying on its license under Section 29 of the Warehouse Act (7 U.S.C.A. § 269), asserts that this Act vests in the Secretary of Agriculture exclusive jurisdiction over all activities of a licensed warehouseman, including stevedoring, wharfage, and dockage activities; citing Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 and Cargill, Inc. v. Commodity Exchange Commission, D.C.D.C.1952, 103 F.Supp. 992. The Warehouse Act does, as Cargill points out, provide that "the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this Act shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect." 7 U.S.C.A. § 269.

Going first to the Shipping Act,[3] we find that Section 1 defines the term

3. The Shipping Act was entitled: "An Act To establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its Territories and possessions and with foreign countries; to regulate carriers by water engaged in the foreign and interstate commerce of the United States; and for other purposes." Act, Sept. 7, 1916, c. 451, 39 Stat. 728. The Maritime Commission was established by Congress to safeguard a special aspect of the national interest by stopping all unjust and unreasonable practices in receiving, handling, storing or delivering property "in connection with a common carrier by water." State of California v. United States, 1943, 320 U.S. 577, 64 S.Ct. 352, 357, 88 L.Ed. 322, rehearing denied 321 U.S. 802, 64 S.Ct. 516, 88 L.Ed. 1089. Cf. United States Navigation Co. v. Cunard S.S. Co., 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408. "The Shipping Act is a comprehensive measure bearing a rela-

"other person subject to this act" to mean "any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water." Of course, effective regulation of common carriage would necessarily involve some supervision over auxiliary services. Cargill comes within the Act, since it furnishes "wharfage, dock, warehouse, or other terminal facilities" at the Baton Rouge grain elevator "in connection" with common carriage by water.

▉ Going now to the Warehouse Act,[4] we find that it does not vest jurisdiction over wharves, docks, and stevedoring in the Secretary of Agriculture. By definition the Act applies to the *storage* of agricultural products, not to maritime activities and facilities. Thus, 7 U.S.C.A. § 242 defines the term "warehouse" to mean "every building, struc-

ture, or other protected inclosure in which any agricultural product is or may be stored for interstate or foreign commerce, or, if located within any place under the exclusive jurisdiction of the United States, in which any agricultural product is or may be stored." The primary concern of the Act is to establish standards for the safe storing of agricultural products in federally licensed warehouses. It seems clear to us that the Secretary of Agriculture is not primarily concerned with Cargill's stevedoring functions and that the Federal Maritime Board is not primarily concerned with Cargill's warehousing functions.

▉ Here, although many of Cargill's facilities and services are of a maritime nature, some pertain to the warehousing business. A geographical line cannot be drawn separating the two. Thus, "loading out" is considered a part of the business of a grain elevator. The loading gallery, surge hoppers, and chutes are

---

tion to common carriers by water substantially the same as that borne by the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.) to interstate carriers by land. * * * In its general scope and purpose, as well as in its terms, that act closely parallels the Interstate Commerce Act; and we cannot escape the conclusion that Congress intended that the two acts, each in its own field, should have like interpretation, application, and effect." United States Navigation Co. v. Cunard S.S. Co., 1932, 284 U.S. 474, 480–481, 52 S.Ct. 247, 249, 76 L.Ed. 408. "The evil of discrimination was the principal thing aimed at by the [Interstate Commerce] Act, see Louisville & N. R. Co. v. United States, 282 U.S. 740, 749, 51 S.Ct. 297, [75 L.Ed. 672], and its language is certainly broad enough to embrace all discriminations of the sort described which it was within the power of Congress to condemn." Merchants Warehouse Co. v. United States, 1931, 283 U.S. 501, 512–513, 51 S.Ct. 505, 509, 75 L.Ed. 1227.

4. "The basic program reflected in the [Warehouse] Act was described in HR Rep No 60, 64th Cong., 1st Sess., p. 1, as follows: 'The outbreak of the European war emphasized the fact that the farm marketing machinery of this country is seriously weak, insufficient, and inadequate—a condition which already had

been more or less recognized by students of farm economics. From a very thorough study of our stystem of marketing there will appear: (1) A lack of adequate storage facilities; (2) a lack of proper control and regulation of such storage systems as exist; (3) an absence of uniformity in their methods of operation and the form of receipts issued; (4) a multiplicity of standards for grading and classification, or in some cases an entire absence of such standards for grading and classification; (5) a lack of disinterested graders, classifiers, and weighers; (6) a lack of proper relationship between the storage and banking systems of the country. The inauguration under this bill of a permissive system of warehouses licensed and bonded under authority of the Federal Government for the storage of staple and nonperishable agricultural products upon which uniform receipts may be issued, the weights and grades of the products specified therein having been previously determined by licensed weighers and graders in accordance with Government standards, would go far in the direction of standardizing warehouse construction, storage conditions, insurance, accounting, financing, and the handling and marketing of farm products." Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 67 S.Ct. 1146, 1154, 91 L.Ed. 1447, footnote 13.

part of the premises of the entire grain elevator and are covered by the license issued by the Secretary of Agriculture. Where would the jurisdiction of the Secretary of Agriculture cease and the jurisdiction of the Federal Maritime Board begin? Somewhere along the loading gallery? Complicating the problem, Cargill is responsible for the quality of grain even after it is stowed by the stevedores aboard the ship. The grain must be determined by laboratory inspection to be of equal quality to the grain called for by the warehouse receipts surrendered for loading. The purpose of this inspection is to correct any mistakes resulting from the delivery of the wrong kind of grain through the spout. But, all of this relates to Cargill's contractual obligations —not necessarily to its stevedoring obligations, as such. If Cargill fails to deliver the proper grain, it must rectify the error. The nature of Cargill's business, therefore, subjects it to the jurisdiction of the Secretary of Agriculture; but no inference can be drawn from this fact that would oust the Federal Maritime Board from its control over Cargill. The Secretary of Agriculture, it should be noted, is not appearing in the case to assert any jurisdiction.

Under the original United States Warehouse Act, enacted in 1916, federal regulation was subservient to state regulation. Section 29 of the original act provided that "nothing in this act shall be construed to conflict with, or authorize any conflict with, or in any way to impair or limit the effect or operation of the laws of any State relating to warehouses, warehousemen * * *." Section 6 required any applicant for a federal warehouse license to post a bond to secure the performance of his obligations. Congress amended the Act in 1931, changing Section 29 so that the Secretary of Agriculture, although authorized to cooperate with State officials charged with the enforcement of state laws relating to warehouses, had exclusive power, jurisdiction and authority with respect to all persons securing a license under the Act. Congress amended Section 6 by deleting the requirement that the bond be conditioned on compliance with requirements of state law. The history and purpose of these legislative changes are discussed in Rice v. Sante Fe Elevator Corp., 1947, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447. This case concludes that a warehouseman is not obligated to operate under the Act, but he may choose to be licensed under it; if he does, he is responsible solely under the federal act, free from the interference of state acts.

In Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447, the state regulatory agency having jurisdiction over warehouse activities brought proceedings against a federally licensed warehouseman. The warehouseman sued in the federal courts to enjoin the proceedings before the state agency and to enjoin the state attorney general from enforcing any order of the agency. In granting the injunction, the Supreme Court held that Congress had exercised its preemptive constitutional power over grain warehouses by adopting a uniform regulatory scheme to be administered by the Secretary of Agriculture. The case was decided on the issue of federal-state relations: "The test, therefore, is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act." Id., 331 U.S. at page 236, 67 S.Ct. at page 1155. Since the matter is regulated by the federal act, the federal scheme of regulation prevails; the matters involved in the suit before the State regulatory commission are beyond its reach. Congress pre-empted the field by declaring its policy in the Warehouse Act. To knock down dual regulation between state and federal systems is a far cry from saying that other federal agencies, within their proper sphere, may not exercise control or regulation along with the Secretary of Agriculture. The Rice decision does not extend the authority of the Secretary of Agriculture into matters beyond the scope of the Warehouse Act.

Cargill relies also on Cargill, Inc. v. Commodity Exchange Commission et al., D.C.1952, 103 F.Supp. 992. In that case

Cargill sued the Commission for a declaratory judgment to determine the validity of certain amended rules and regulations adopted by the Chicago Board of Trade. 7 U.S.C.A. § 7a(7), part of the Commodity Exchange Act, authorizes local boards of trade to set up reasonable warehousing requirements for warehouses whose receipts are traded at the local board of trade. The Chicago Board of Trade adopted rules requiring all persons in the Chicago area operating federally licensed warehouses to file formal application with the Board to have each such warehouse declared to be "regular" if the warehouse receipts were to be accepted on grain futures contracts. The local board's regulations went far beyond the "reasonable requirements" authorized by the Act. The district court held, properly enough, that the Act authorizing local boards of trade to set up ground rules for trading in warehouse receipts did not intend to impair the principle of exclusive federal control of the *operation* of federally licensed warehouses. Again, this is a far cry from holding that the Secretary of Agriculture's control is exclusive as against other federal agencies.

Businesses are frequently subject to regulation by several government agencies. We see nothing unusual in Cargill's being subject to the regulatory authority of the Secretary of Agriculture in its warehousing activities and at the same time being subject to the regulatory authority of the Federal Maritime Board when it furnishes maritime facilities and services. The situation would be anomalous if it were otherwise.[5]

We hold that both Cargill and the Port Commission are subject to the Shipping Act, and subject to the jurisdiction of the Federal Maritime Board.

### III.

Cargill argues that Agreement 8225 was not within Section 15 of the Shipping Act. Section 15 of the Shipping Act requires persons subject to the Act to file with the Board every agreement relating to "fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement." The term "agreement" in this section "includes understandings, conferences, and other arrangements."

The Chief Examiner of the Board was in accord with Cargill. He found that the agreement is "purely and simply a lease establishing Cargill as tenant and the Port as landlord." It seemed to the Board, and it seems to us, that the agreement "goes far beyond the usual provisions of a mere lease of property."

Under Article 10 of the original agreement Cargill agreed "to the extent economically feasible that it will give preference to this grain elevator over other grain elevators operated by [it] in the Gulf area," and that Cargill would "maintain and publish rates and charges for the handling and storage of grain upon or within the facility on a competitive basis to rates published for similar services at New Orleans and other competitive Gulf ports. * * *" In Article 17 of the agreement the Port Commission agreed that its rates for privileges and services would be competitive with rates for similar services charged at other Gulf ports, that "during the term of this lease Cargill shall have the exclusive right to operate hereunder a public grain elevator within the Port area as such

---

5. Baltimore & Ohio R. Co. v. United States, 3 Cir., 1953, 201 F.2d 795, holds that a railroad providing maritime terminal operations is subject to regulation by both the Interstate Commerce Commission and the Federal Maritime Board, the former with respect to its full operations, the latter with respect to its maritime operations.

area is defined by law," and that if "the Port decides to construct additional grain storage and handling facilities, Port must first offer such facilities to Cargill for operation. * * *" In its Report the Board states that "[t]hese provisions fix and regulate transportation rates or fares, give special privileges or advantages, control, regulate, prevent or destroy competition, and provide for an exclusive, preferential or cooperative working arrangement within the meaning of Section 15."

The provisions for (1) the *preference* to the Baton Rouge elevator over other elevators in the Gulf area, (2) the *regulation of rates* (required to be competitive with other Gulf ports), (3) Cargill's *exclusive* right to operate a grain terminal, and (4) Cargill's *first refusal* on any additional terminals, take the agreement out of the ambit of ordinary leases and place it squarely within the terms of Section 15. This is no ordinary grain elevator. It is operated at a port. Its function is to facilitate the loading and unloading of grain for vessels using the port because of its handling and storage services. It is part and parcel of an over-all scheme for the greater commercial development and use of the Baton Rouge port area. An agreement pertaining to the exclusive operation of such an elevator, dealing with preferences and rates, maritime services and facilities, has such a significant maritime connection as to fall well within the jurisdiction and scope of authority of the Federal Maritime Board.

▆ Since the agreement comes within the terms of the Act, Board approval must be secured before the agreement can be carried out by the parties. Here, the Board approved the original agreement, finding it not unjustly discriminatory or unfair, and not detrimental to the commerce of the United States.[6] This conclusion is not contested by any of the parties. We leave it undisturbed.

IV.

Agreement 8225-1 amended Section 10 of Agreement 8225 by adding the following provision:

"Cargill further is required to and agrees to provide and furnish stevedoring services to vessels loading or unloading at the wharf, it being recognized that vessels loading or unloading should be integrated into the overall elevator operations so as to provide efficient service, both to such vessel and to persons depositing commodities into the elevator. It is deemed to be a reasonable rule and regulation in the operation of the wharf which is part of the leased property, for Cargill to condition the loading or unloading of a vessel upon the requirement that Cargill's integrated stevedoring service be used by such vessels."

Article 10 was also amended to require Cargill to "maintain and publish rates and charges * * * in a competitive basis to rates published or charged for similar services at New Orleans and other competitive Gulf ports * * * for the stevedoring of vessels loaded or unloaded at the wharf."

Section 15 of the Shipping Act authorizes the Board to disapprove, cancel or modify any agreement found to be "unjustly discriminatory or unfair" or operating to the "detriment of the commerce of the United States". 46 U.S.C.A. § 814. Section 17 authorizes the Board to determine, prescribe and order the enforcement of a "just and reasonable regulation or practice" whenever it finds regulations or practices established by persons subject to the Act to be "unjust

6. The Board pointed out in its Report that "This exclusive lease, Agreement No. 8225, has never been approved by the Board as required by said Section 15, but has been carried out by the parties since September 7, 1955. To this extent respondents Cargill and the Port have acted unlawfully and in violation of Section 15." Even though the parties violated the statute, the Board approved the agreement. If the Board finds no cause to complain of the violation, neither do we.

or unreasonable." 46 U.S.C.A. § 816. The Board's decision in the instant case applied both of these sections. After considering Agreement 8225–1, the Board refused to approve it, holding that Agreement 8225–1 resulted in a monopoly of stevedoring services detrimental to the commerce of the United States. See Baker-Whiteley Coal Co. v. Baltimore & O. R. Co., 4 Cir., 1911, 188 F. 405; Donovan v. Pennsylvania Co., 1905, 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192. See also Isbrandtsen Co. v. United States, 1954, 93 U.S.App.D.C. 293, 211 F.2d 51, 57; McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544.

The Port Commission and Cargill contend that Agreement 8225–1 does not come within the purview of Section 15 of the Shipping Act, and that these provisions merely represent the exercise of the free right of managerial judgment by the Commission as owner and Cargill as operator of the property. But if Agreement 8225 comes within Section 15, as we have held, then *a fortiori* Agreement No. 8225–1, which broadens the lease to include stevedores—clearly a maritime concern—comes within Section 15.

Stevedoring is traditionally maritime. Stevedoring of grain requires a close relation between the stevedore and the vessel, a careful inspection of the ship, a sound plan of stowage, and skillful execution of the plan. There is a complete separation between the function of the elevator in delivering the grain and the function of a vessel in receiving it. There is no physical connection between vessel and elevator except guide lines to hold the spout discharging grain into a hatch. The elevator workers perform no services on the vessel; the longshoremen perform no services in the elevator or on the wharf.

Accordingly, under Section 15, we find that Agreement 8225–1 required the approval of the Board in order for it to become effective.

### V.

The Board's decision was reached after a full hearing, including submission of briefs and oral argument. The Board was set up by Congress to determine questions of fact and make administrative orders on the basis of its informed judgment and discretion. If the Board's order is supported by sufficient evidence considering the record as a whole, and if the order has a reasonable basis in law, this Court will not disturb it.[7]

In spite of the fact that the ship's master is legally responsible for the proper loading and seaworthiness of the vessel, Agreement 8225–1 would prohibit the vessel from participating in the selection of its stevedore. The Agreement would make the Baton Rouge elevator the only one of nine elevators in the Gulf area not "open" to stevedores. Cargill asserts that the agreement will result in a "more efficient and economical over-all operation." Efficiency is not enough. It is not a cure-all. Not in our system of law.

Cargill and the Port Commission assert that the exclusive stevedoring contract enabled the Port Commission to secure favorable rental payments which are necessary in order for the Commission to finance its operations, the Commission having no power to tax and not having the benefit of taxes being dedicated to it. La.Const. of 1921, Art. VI, Section 29. Monopolies secure economic advantages. They are expected. But if economic advantages are factors to be considered at all, they are to be weighed and evaluated by the Federal Maritime Board. Not by us in our appellate role.

The record does not justify Cargill's high opinion of its stevedoring activities.

7. This principle is firmly established, beyond the realm of contestation. See 4 Davis, Administrative Law, §§ 29.01–30.-14; Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926; Swift & Co. v. United States, 1952, 343 U.S. 373, 72 S.Ct. 716, 96 L.Ed. 1008; United States Nav. Co. v. Cunard S.S. Co., 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408; Manufacturers R. Co. v. United States, 1918, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831; Pennsylvania Co. v. United States, 1915, 236 U.S. 351, 35 S.Ct. 370, 59 L.Ed. 616.

Over 80% of the vessels free to select the stevedore chose BARMA rather than Rogers, Cargill's affiliate. The average hourly tonnage loaded by BARMA has substantially exceeded that of Rogers, before and after the exclusive arrangement.[8] The record shows that the stevedoring services and efficiency of BARMA steadily improved and are in some cases superior to Rogers' services. BARMA has held on to half of the grain stevedoring business at Baton Rouge even though Cargill's affiliates have appointed Rogers as stevedore.

Cargill argues that its legal obligation to provide stevedoring services in accordance with specified standards, thereby protecting vessel owners and operators against unreasonable charges for stevedoring, removes any possibility that the amendment could be detrimental to commerce or in any way conflict with Section 17 of the Act. No matter how desirable an agreement may appear, no matter how beneficent the monopoly may appear, Congress has commanded that agreements limiting or destroying competition must first be approved by the Board before they may be lawfully carried out. National policy favors free and healthy competition; monopoly is the exception. Here, to rely on the agreement's alleged built-in safeguards, preventing harmful effects of a monopoly, is to fail to look at the total picture. It would take away, too, the Board's function and arrogate it to us. This we will not do if there is a reasonable basis for the Board's decision. On the record, as we read it, there is a rational foundation in law and in fact for the Board's conclusion that Agreement 8225-1 would be unjustly discriminatory, unfair, and unreasonable, and therefore detrimental to commerce in the United States.

We summarize. Cargill is subject to the jurisdiction of the Federal Maritime Board, whether or not it is also licensed as a warehouseman by the Secretary of Agriculture. The exclusive lease arrangement embodied in Agreement 8225 between Cargill and the Port Commission is within the scope of Section 15 of the Shipping Act. The Board properly approved it. The restrictive stevedoring arrangement in Agreement 8225-1 is also within the scope of Section 15. Under Section 17, the Board properly found that Agreement 8225-1 violates the standards established in the Shipping Act.

There being no legal basis for setting aside or modifying the order of the Board, the petition is denied.

8. Rogers loaded 262.5 tons per hour in 1956, when it began operations; 326.3 tons per hour in 1957; and 259.4 tons per hour in the first quarter of 1958. BARMA, on the other hand, has increased its rate of loading from 364.7 to 445.9 to 510.6 tons per hour in the same periods. BARMA loaded an average of 40% more grain per hour than Rogers at the date of the hearing, April 1958.