Decided April 21, 1988

DISTRICT COURT FOR THE
NORTHERN MARIANA ISLANDS

A & E. PACIFIC CONSTRUCTION ) CIVIL ACTION NO. 88-0001
COMPANY, et al., )
 )
 Plaintiffs, )
 )
 v. )
 )
SAIPAN STEVEDORE COMPANY, ) DECISION AND ORDER
INC., et al., )
 )
 Defendants. )
_____)

Plaintiffs filed a seven-count class action suit against defendants Commonwealth Ports Authority (CPA), its directors, and Saipan Stevedoring Company (SSC) alleging the defendant had engaged in predatory pricing, conducted a public utility in an unreasonable manner, breached fiduciary duties to taxpayers, violated plaintiffs' civil rights, and engaged in anti-competitive acts in violation of the Sherman Anti-trust Act. Plaintiffs sought a temporary restraining order to prevent defendants from continuing to impose its increased tariff schedules. Defendants moved to dismiss the action alleging that the Federal Maritime Commission (FMC) has exclusive jurisdiction over all of plaintiffs' claim except for count one which is based on predatory pricing in the trucking industry. The Court agrees with defendants and dismisses plaintiffs' complaint on all counts except count one.

## FACTS

Charlie Dock, the commercial port of Saipan, is located in Tanapag Harbor. The major portion of the region's commerce both import and export is funneled through this port. In 1975, SSC leased Charlie Dock from the Trust Territory of the Pacific Islands (TTPI) for the purpose of providing stevedoring services in the Commonwealth of the Northern Mariana Islands (Commonwealth), which it has done exclusively since that time. In 1978, SSC leased the property from MPLC, the successor authority of the dock. In 1985, SSC leased Charlie Dock and adjoining areas from Commonwealth Ports Authority (CPA). The lease with CPA provided, among other things, that SSC would have the exclusive right to operate the port. In exchange, SSC agreed to pay CPA a monthly rental. CPA's attorney forwarded the lease to Washington, D.C., in an effort to comply with FMC regulations which required the filing of all terminal operator agreements. In 1987, FMC informed CPA that the lease had originally been sent to the wrong address but it had finally arrived in the right office. FMC informed CPA that the lease was effective as of July, 1987.

In December, 1987, SSC circulated a notice to many of its customers informing them that its rates would be raised for various services. A group of local businesses formed an association called "Concerned Port Users" and retained attorney Robert O'Connor to represent their interests in pursuing a moratorium on SSC's rate increases. O'Connor was

375

unable to convince SSC to reconsider the rate increase. O'Connor wrote to FMC and requested that the new rates be investigated by FMC. He subsequently filed this suit seeking a legal remedy in this Court.

The suit, filed January 19, 1988, alleges that SSC reduced its trucking rates below cost to retaliate against plaintiffs Larry Guerrero and George Fleming, who both operate trucking companies, for opposing SSC's new tariffs. Plaintiffs' second cause of action alleges that SSC is a public utility which acted unreasonably, unfairly, and discriminatorily when it unilaterally raised its tariffs in December, 1987. The third cause of action is against CPA for breaching its fiduciary duty to taxpayers by granting an unregulated monopoly to SSC. Under count four, plaintiffs allege that defendants violated plaintiffs' constitutional rights of equal protection and due process in contravention of the Fourteenth Amendment and 42 U.S.C. §1983. Plaintiffs' fifth cause of action asserts that the exclusive lease agreement between SSC and CPA is a violation of the Sherman Anti-trust Act. The sixth cause of action alleges that the monopoly lease agreement also violates Commonwealth anti-trust law. Finally, plaintiffs' seventh cause of action seeks damages for losses suffered as consumers.

On February 11, 1988, plaintiffs moved for a preliminary injunction and declaratory judgment. The motion sought to prevent SSC from imposing or collecting additional rates under the new tariff. On February 17, 1988, defendants

**376**

moved to dismiss the complaint except as to the first count involving predatory pricing in the trucking industry. Defendants alleged that FMC had exclusive authority to consider the propriety of lease agreements and consequent tariff schedules of terminal operators.

## ANALYSIS

### I. Predatory Pricing in SSC's Trucking Business.

The motion to dismiss the complaint is directed only at counts two through seven. The first count, based on predatory pricing in SSC's trucking business is not subject to the jurisdiction of FMC and will remain in this Court.

### II. The Lease Agreement Between SSC and CPA.

In 1916, the United States Congress enacted the Shipping Act. The Act set up a comprehensive regulatory scheme which, inter alia, granted limited anti-trust immunity to ocean shipping lines. The United States Shipping Board was established under the Act to regulate the ocean shipping industry. Judicial interpretations following enactment of the Act, however, limited the anti-trust immunity and narrowed its scope. Seawinds Ltd. v. Nedlloyd Lines, B.V., 80 B.R. 181, 184 (N.D.Cal. 1987). Further, the injecting of the judicial branch into maritime regulation created parallel jurisdiction in the courts and the United States Shipping Board. Id. The disposition of shipping claims in separate forums necessarily resulted in uncertainty in the

377

regulatory scheme.

As a consequence, Congress re-wrote the Act and enacted it as the Shipping Act of 1984 (Act). The new Act made several changes. Among them, the Act limited actions for relief from conduct proscribed by the statute to the Federal Maritime Commission (FMC), the successor to the United States Shipping Board. The Act also extended anti-trust immunity beyond the shipping lines themselves. More importantly, for purposes of this case, the Act abolished private rights of action for anti-trust violations based on agreements which fell within the jurisdiction of the Act. Seawinds, 80 B.R. at 184. The Act vested exclusive jurisdiction for these violations in FMC. Title 46 U.S.C. §1702 (27) provides that the Act applies to the Northern Mariana Islands.

The Act exempts agreements filed with FMC from the penumbra of federal anti-trust laws. 46 U.S.C. 1706(a). To be protected, however, the agreement must be filed and effective. Id. Plaintiffs allege that the agreement they seek to set aside between CPA and SSC was not filed with FMC and was not effective. The record contains several correspondences from FMC indicating that although the SSC lease agreement was originally mailed to a non-entity the FMC had obtained a copy of it and had determined that it was effective July 18, 1987. Plaintiffs raise several reasons why FMC was wrong, why the filing was never effective, and why, even if it was, the anti-trust immunity did not apply for the period from 1985 through 1987. In Greater Baton Rouge

<u>Port Commission v. United States</u>, 287 F.2d 86 (5th Cir. 1961), <u>cert. denied</u>, 368 U.S. 985 (1962), this same argument was raised. There, the parties failed to follow the Act's requirements regarding exclusive leases. The court stated that, "[e]ven though the parties violated the statute, the Board [United States Shipping Board] approved the agreement. If the Board finds no cause to complain of the violations, neither do we." <u>Id.</u> at 93, fn. 6.

FMC was faced with the same facts in the spring of 1987. It reviewed, approved, and deemed the lease effective. It is not this Court's province to second guess FMC and determine de novo if it followed its own regulations.

Plaintiffs assert that CPA, a government agency, is not an entity envisioned by the Act and, therefore, the lease does not fall within its protections. Again, FMC determined to the contrary. FMC is the expert on its regulations and there is no indication that it misinterpreted the regulations. Furthermore, in <u>Greater Baton Rouge</u>, cited supra, the Fifth Circuit ruled that an exclusive operating agreement between a grain operator and the government entity operating the port fell within the ambit of the Act. There is no reason to depart from this authority.

Plaintiffs cite numerous reasons why the lease was contrary to Commonwealth law and could not be approved by FMC. Plaintiffs argue that the CNMI Legislature did not give CPA authority to create a monopoly. However, the legislature did not

379

prohibit such conduct either. Plaintiffs contend that without such authorization it must be presumed illegal. But does not the inverse pose at least as compelling an argument? Without a prohibition against creating a monopoly none is restricted.

 The federal government prohibits monopolies. So do most states. Monopolies, however, are not the exception but the rule in maritime operations. The federal scheme provides for regulation and control of these anti-competitive practices in this limited sphere. Certainly, the legislature did not expect CPA to start taking containers off ships and transporting them to island businesses. The legislature must have assumed that CPA would arrange for a private company or companies to do so. CPA chose SSC which, to the Court's understanding, has been established in this position for many years. The lease may have on its face been violative of anti-trust law but case law supports the proposition that the government is exempt from these laws in situations like this. Woods Exploration and Producing Co. v. Aluminum Company of America, 284 F.Supp 582, aff'd in part, rev'd in part, 438 F.2d 1286, cert. denied, 404 U.S. 1047; California Business and Professions Code, §17024 (anti-trust law does not apply to California Public Utilities Commission); California Public Resources, §3320.1 (anti-competitive laws do not apply to State's agreements with oil and gas miners.)

Plaintiffs take exception to CPA's total surrender of regulatory power over the port, but the reasoning put forth above applies here as well. The fact that the law is silent on the

**380**

issue of retaining regulatory control can be cited for the proposition that CPA can give this authority away just as easily as it has been cited for the opposite conclusion. The legislature has on at least one other occasion taken an affirmative stand regarding the granting of regulatory control. In Public Law 4-47, which established the Commonwealth Utilities Corporation (CUC), the legislature specifically provided that if and when a utility is turned over to the private sector the compliance division of CUC shall monitor the utility, including rates. Section 8121(d). Apparently, the legislature is cognizant of the ramifications of turning over important operations to the private sector and has chosen in some situations to limit a broad grant of authority to the private sector. This is not the case with regards to CPA.

Plaintiffs next argue that CPA failed to follow Commonwealth procurement regulations in obtaining SSC as the marine terminal operator. Assuming arguendo that the procurement regulations applied to contracts like this one, it is clear that Commonwealth procurement regulations do not apply to autonomous agencies like CPA and consequently this argument must fail. See, Department of Finance Procurement Regulations, Vol. 7, No. 7, p.3736, §1-201(9).

It is for these reasons that the Court deems that jurisdiction over this matter lies with FMC. Stripping away plaintiffs' federal anti-trust claims leaves only Commonwealth causes of action which this Court does not have jurisdiction to

entertain. The Court is not insensitive to plaintiffs' concerns regarding SSC'c lease of the port. The port is the heart of the commercial industry of the Commonwealth. Control of the port is in reality control of the Commonwealth economy. It is fair to characterize as ill-advised CPA's grant of an exclusive lease while failing to control the rates. The legislature has seen fit to ensure that at least as far as utilities are concerned this does not happen again.

The comprehensive regulatory scheme set up by the United States Congress with the Shipping Act of 1916 and later the Act of 1984 prevents this Court from remedying what it perceives, perhaps, as a myopic response to a long-term problem. Plaintiffs are left to their remedies with FMC. However, the fact that the strength of the Shipping Acts of 1916 and 1984 have allowed them to endure over the last 72 years, encourages the Court to believe that its concerns will be addressed and this situation will be resolved.

Counts two through seven inclusive are DISMISSED, and accordingly, plaintiffs' motion for injunctive relief is DENIED.

IT IS SO ORDERED.

DATED this _2/5_ day of April, 1988.

_____
Judge Alfred Laureta

382