CARGILL, INC., Petitioners,

v.

FEDERAL MARITIME COMMISSION and United States of America, Respondents,

Baton Rouge Marine Contractors, Inc., Intervenor.

BATON ROUGE MARINE CONTRACTORS, INC., Petitioner,

v.

FEDERAL MARITIME COMMISSION and United States of America, Respondents,

Cargill, Inc., Intervenor.

Nos. 75–1018 and 75–1108.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1975.

Decided Feb. 12, 1976.

---

3. *Gulf States Utilities Co. v. FPC*, 171 U.S.App. D.C. 57, 518 F.2d 450, 457 (1975).

Edward J. Sheppard, Washington, D. C., with whom Edward Schmeltzer and Cecelia E. Wirtz, Washington, D. C., were on the brief for petitioner in No. 75–1018 and intervenor in No. 75–1108.

Edward S. Bagley, Covington, La., for petitioner in No. 75–1108 and intervenor in 75–1018.

Gordon M. Shaw, Atty., Federal Maritime Commission, with whom James L. Pimper, Gen. Counsel and Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., were on the brief for respondent Federal Maritime Commission.

Robert J. Wiggers, Atty., Dept. of Justice, with whom Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., was on the brief for respondent, United States of America. Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent, United States of America.

Before LEVENTHAL, Circuit Judge, LUMBARD,* Senior Circuit Judge for the Second Circuit and WILKEY, Circuit Judge.

LEVENTHAL, Circuit Judge:

This appeal involves two petitions for review, under 28 U.S.C. § 2342,[1] of the report and order of the Federal Maritime Commission in Docket No. 71–29, issued January 7, 1975, which held that the terminal operator for the Port of Baton Rouge could institute charges against stevedores for the use of terminal facilities and services but that its 8-cents per ton service and facility charge was unlawful under § 17 of the Shipping Act (Act), 46 U.S.C. § 816,[2] to the extent it was not reasonably related to the benefits accruing to stevedores. The Commission remanded the proceeding to the Administrative Law Judge (ALJ) for a determination of what would constitute a "proper allocation of services and facilities benefits to stevedores . . . in order to arrive at a charge that can be properly assessed against the stevedores" (J.A. 75). Commissioners Barrett and Morse dissented on the ground that Cargill's allocation to the stevedores was sufficiently related to benefits to pass muster under § 17.

In No. 75–1018, Cargill, Inc., the terminal operator, maintains that its service and facility charge is reasonably related to the benefits provided to stevedores; that the Commission applied a public utility ratemaking standard rather than the less exacting reasonableness standard appropriate under § 17; and that the Commission's order suspending the 8-cents charge pending further hearing before the ALJ is, in effect, an interlocutory injunction beyond its statutory power. In No. 75–1108, Baton Rouge Marine Contractors, Inc. (Barma), a corporation comprised of four stevedores, argues that Cargill's charge violates § 15 of the Act, 46 U.S.C. § 814,[3] because it is a

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 28 U.S.C. § 2342, as amended in 1966, gives the courts of appeals exclusive jurisdiction over such final orders of the Federal Maritime Commission as are made reviewable under 46 U.S.C. § 830.

2. 46 U.S.C. § 816 provides in relevant part:

Every such carrier [by water in foreign commerce] and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Commission finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.

3. 46 U.S.C. § 814 provides in relevant part:

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative work-

modification, without requisite specific FMC approval, of Cargill's underlying Commission-approved lease agreement with the Greater Baton Rouge Port Commission (Port); and violates § 16 of the Act, 46 U.S.C. § 815,[4] because it creates illegal preferences and privileges for Cargill through the use of Cargill's wholly-owned subsidiary, Rogers Terminal and Shipping Corporation (Rogers), in competition with Barma at the Baton Rouge facility. The Department of Justice (Antitrust Division), representing the United States as statutory respondent, agrees with the Commission that Barma has not proven a violation of §§ 15 or 16, but disputes the Commission's intimation that it would approve

ing arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of independent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal.

The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it, or of failure or refusal to adopt and maintain reasonable procedures for promptly and fairly hearing and considering shippers' requests and complaints.

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicable to noncontract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817(b) of this title and with the provisions of any regulations the Commission may adopt.

Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1 to 11 and 15 of Title 15, and amendments and Acts supplementary thereto.

4. 46 U.S.C. § 815 provides in relevant part:

It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided,* That within thirty days after enactment of this Act, or within thirty days after the effective date or the filing with the Commission, whichever is later, of any conference freight rate, rule, or regulation in the foreign commerce of the United States, the Governor of any State, Commonwealth, or possession of the United States may file a protest with the Commission upon the ground that the rate, rule, or regulation unjustly discriminates against that State, Commonwealth, or possession of the United States, in which case the Commission shall issue an order to the conference to show cause why the rate, rule, or regulation should not be set aside. Within one hundred and eighty days from the date of the issuance of such order, the Commission shall determine whether or not such rate, rule, or regulation is unjustly discriminatory and issue a final order either dismissing the protest, or setting aside the rate, rule, or regulation.

under § 17 an allocation of the charges to the stevedore going beyond express contract, custom, or actual use.

We affirm the Commission on all counts. Cargill's charge, while unprecedented at Baton Rouge, comes within the broad authority conferred by its Commission-approved lease with the Port and does not require specific approval under § 15. We reject Barma's claim of a *per se* violation of § 16 premised only on the fact that Cargill also does business with its wholly-owned stevedore Rogers, in the absence of proof of discriminatory practices. Finally, we find that the Commission acted within its mandate under § 17; that its approach here in disapproving certain allocations to the stevedore is not arbitrary or capricious; and that its order does not prevent an interim levy by Cargill pending further determination of what may properly be assessed against the stevedore. We decline to consider the Justice Department's contention because it was neither raised before the Commission nor advanced by Barma in its petition for review.

## I. *Background*

By a lease agreement, the Port granted Cargill, as lessee, "the exclusive right to operate hereunder a public grain elevator within the Port Area." The Cargill facility opened in September, 1955, and Barma has stevedored vessels there from its inception. In March, 1957, the Port and Cargill amended the lease agreement so as to authorize Cargill to provide stevedoring services and "to condition the loading or unloading of a vessel upon the requirement that Cargill's integrated stevedoring service be used by such vessels." The Commission's predecessor agency, the Federal Maritime Board, approved the basic lease, but disapproved the exclusive stevedoring

amendment under § 15 and as an "unreasonable practice" under § 17, *Agreements Nos. 8225 and 8225–1*, 5 F.M.B. 648, 655–56 (1959). The Court of Appeals for the Fifth Circuit affirmed, *Greater Baton Rouge Port Commission v. United States*, 287 F.2d 86 (5th Cir. 1961), *reh'g denied*, 293 F.2d 959, *cert. denied*, 368 U.S. 985, 82 S.Ct. 600, 7 L.Ed.2d 523 (1962).

As to the dispute in question, on February 4, 1971, Cargill informed Barma and all other stevedores using its Baton Rouge facility that charges would be imposed for use of services and facilities.[5] Several days later, Cargill demanded that the stevedores sign an agreement requiring payment of 5-cents per ton of grain handled by Cargill and $50.00 per vessel to defray the cost of cleaning the dock (J.A. 313).[6] Since Cargill indicated it would not deliver grain to a vessel employing a nonsigning stevedore, Barma signed "under protest and with full reservation of its rights" (J.A. 319–20). Informed by Barma of the stevedore charges, the General Counsel of the Port wrote to Cargill asking that they be postponed until their legality could be determined (J.A. 303). The Port, however, made no formal complaint and did not participate in the FMC proceeding. On March 29, 1971, Barma filed a complaint with the Commission resulting in the administrative actions under review here.

## II. Section 15

Barma claims that the action by Cargill represents a wholly novel and unanticipated practice that constitutes a modification of its agreement with the Port of Baton Rouge, and hence under § 15 is not effective until approved by FMC. FMC's ruling rejecting this claim has two aspects: (1) that the lease to Cargill gave it a broad authority which em-

---

**5.** Cargill had not previously charged stevedores for the use of terminal services and facilities at Baton Rouge, although it had done so at the Port of Houston in 1967. Four other Louisiana grain elevators had instituted such charges, although Cargill's main competitor, the public grain terminal at New Orleans, had not done so.

**6.** During the course of the administrative hearings, Cargill informed the stevedores that the charge would be increased to 8-cents per ton, effective 30 days after the date of a Commission decision in Cargill's favor, and this would include the dock clean-up charge (J.A. 395).

braces such a practice even though it was not specifically foreseen; and (2) that Cargill's exercise of what it understood to be its authority under the lease—even if it was wrong—was a unilateral action, and not an "agreement" requiring FMC approval.

 We reject the FMC's alternative ground, that Cargill's action was a unilateral undertaking and not an "agreement" subject to § 15, for this might open the door to evasion of § 15, through unilateral actions by one party to an agreement and failure to protest by the other.[7] However, we agree with the FMC that the lease between the Port and Cargill can fairly be read to authorize the terminal operator to seek a return on his capital improvements by levying charges against those parties reaping the benefit of his equipment. There is room for deference to the agency on the interpretation of industry agreements[8]—though, of course, less than is due for findings of fact. The language of the lease is broad enough to give Cargill the same charging authority in this respect as any operator of such a terminal—subject, of course, to FMC regulatory authority, and subject to the requirement that the charges be competitive (and not cause a loss of business to any other port).[9] The FMC approved the agreement by which the Port gave

the lessee this operating authority—and thenceforth the lessee made individual decisions like any other operator within the bounds of the lease. This is not a case of a fundamental change in rate-making methodology that gives a whole new competitive direction to ratemaking authority. Contrast *Pacific Westbound Conference v. FMC,* 440 F.2d 1303 (5th Cir.), *cert. denied,* 404 U.S. 881, 92 S.Ct. 202, 30 L.Ed.2d 162 (1971) (§ 15 approval required for agreement between two ratemaking conferences conferring mutual veto power over certain rates).

 Barma argues that Cargill and the FMC are barred from relitigating the issue whether the underlying lease agreement governs the relationships between Cargill and stevedores because the Fifth Circuit answered this in the negative in *Greater Baton Rouge Port Commission v. United States, supra.* There is no merit to this res judicata argument. The issue determined by the Fifth Circuit was whether Cargill's lease with the Port and an attempted amendment to establish an *exclusive* stevedoring arrangement were subject to § 15; Cargill's rate-making power under the lease as to stevedores was simply not at issue. The language quoted by Barma to the effect that the amendment broadened the lease to reach stevedores[10] must be

---

7. Moreover, if Cargill enjoys unilateral authority to impose novel charges without seeking prior approval under § 15, because any such unilateral course is not an "agreement" subject to that provision, the corollary is that there would be no § 15 immunity against antitrust actions, if, *e. g.,* Barma or the Department of Justice should bring an action charging that Cargill and its stevedore subsidiary have entered into a combination or contract in restraint of trade.

8. *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 114, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); *Gulf States Utilities Co. v. FPC,* 171 U.S.App.D.C. 57, 64, 518 F.2d 450, 457 (1975); *North Atlantic Westbound Freight Ass'n v. FMC,* 130 U.S. App.D.C. 122, 124, 397 F.2d 683, 685 (1968).

9. The lease required that Cargill "establish and enforce reasonable rules and regulations in the operation of the leased property"; "maintain and operate the same in an efficient manner"; and "maintain and publish rates and charges for the handling and storage of grain . . .

on a competitive basis to rates published for similar services at New Orleans and other competitive Gulf Ports" (J.A. 294).

10. The Port Commission and Cargill contend that Agreement 8225–1 does not come within the purview of Section 15 of the Shipping Act, and that these provisions merely represent the exercise of the free right of managerial judgment by the Commission as owner and Cargill as operator of the property. But if Agreement 8225 comes within Section 15, as we have held, then *a fortiori* Agreement No. 8225–1, which broadens the lease to include stevedores—clearly a maritime concern—comes within Section 15.

287 F.2d at 94.

Barma also quotes the following language from the Federal Maritime Board's opinion in the *Greater Baton Rouge Port Commission* litigation, which was substantially incorporated by the Fifth Circuit in its decision, *id:*

There is a complete separation of the function of the elevator in delivering grain and that of the vessel in receiving and stowing it.

viewed in the context of what was actually decided; an exclusive stevedoring arrangement would indeed have entailed a modification of the agreement.

## III. Section 16

 Barma claims that Cargill's charges against it are a *per se* violation of § 16 because Cargill employs its wholly-owned subsidiary, Rogers, as a competing stevedore. This was properly rejected by the Commission, which reasoned that as long as Cargill's terminal is open to all stevedores and its charges are imposed equally against all stevedores (including its subsidiary) there is no "unreasonable preference or practice" under § 16. Barma has made no showing that Cargill's charges have in fact harmed its competitive position vis-à-vis Rogers, although Barma may have suffered some decline in profits.[11] While, as the Commission noted, the situation in this case "could give rise to discriminatory practices" (J.A. 69), the record simply does not support Barma's apprehension that Cargill intends by predatory practices to drive it out of the Baton Rouge Port.

## IV. Section 17

Regarding its authority under § 17 as extending to the "practices" by a terminal operator of levying charges against stevedores for services rendered by its grain elevator, the Commission found

Cargill's 8-cents charge against Barma an "unreasonable practice" to the extent it relied on certain improper allocations.

It is true, as Cargill notes, that the FMC's scope of scrutiny under § 17 is somewhat narrower than with respect to common carriers by water in domestic and foreign commerce. But under *Volkswagenwerk v. FMC,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), the agency's ambit of inquiry is nonetheless substantial. The Supreme Court specifically held that "even though the benefits received are clearly substantial," the "proper inquiry under § 17 is, in a word, whether the charge levied is reasonably related to the service rendered." 390 U.S. at 282, 88 S.Ct. at 941. *See California v. United States,* 320 U.S. 577, 584–85, 64 S.Ct. 352, 88 L.Ed. 322 (1944). That was the inquiry undertaken by the Commission in this case.

One can make the economic argument that there is no difference in the long run whether the cost of the grain elevator is charged to the stevedore rather than the vessel, because the charges will be passed on to the party, usually the vessel, employing the stevedore to load and trim the vessel. In the long run, the stevedore's charge will be borne by the ultimate beneficiary of the services, the consumer, regardless of whether the stevedore is employed by and paid in the first instance by the vessel or shipper. But at least in the short run, different consequences will attach to differences

There is no physical connection between vessel and elevator except mooring and guide lines. The latter hold the spout which discharges the grain into the hatch under control of the stevedore. The elevator has completed delivery when the grain flows out of the spout. All remaining functions are those of the stevedore, who in effect takes over the ship's operation for the time being. The elevator personnel perform no function on the vessel; the stevedore personnel perform no services in the elevator or on the wharf. There is, of course, necessity for cooperation between the two groups as the stevedore must signal terminal personnel in order to control the flow of grain.

*Agreements Nos. 8225 and 8225–1, supra,* 5 F.M.B. at 651. This language is quoted out of context, for the issue addressed is whether primary regulatory authority over Cargill's activities with respect to stevedoring rests with the

Department of Agriculture or the Federal Maritime Board. The determination that stevedoring is essentially a maritime matter within the Board's purview has no bearing on the issue in this case—whether the terminal operator furnishes services and facilities to the stevedore for which charges may be assessed. The fact that stevedores may perform no services on the leased premises does not mean that they do not derive benefit from them.

**11.** As the record presently stands, Barma has lost none of its share of the stevedoring market at Baton Rouge and has actually increased its share during the first six months of the charge, primarily because Barma's rates did not reflect the new Cargill charge during this period (J.A. 17). On some occasions, Cargill as charterer has chosen Barma rather than Rogers to act as stevedore (J.A. 205).

in the immediate incidence of the charges, depending on the documents negotiated and entered into by the parties prior to the imposition of the new charges. Moreover, the separation out and identification of the various charges may have a kind of psychological spillover effect on the behavior of the various parties, which the Commission can properly take into account.

█ The Commission has taken the position, first stated in *Pacific Northwest Tidewater Elevators Ass'n,* 11 F.M.C. 369, 388 (1968), that the contractual division of responsibility between the buyer and seller of grain does not control the proper allocation of terminal costs, and that those costs should be distributed, to the extent possible, in accordance with "actual use." This analysis, however primitive as a matter of economic theory, is in our view a reasonable interpretation of the Commission's mandate under § 17.

Here the Commission has ruled that while the grain terminal is rendering services to the stevedore, it is an "unreasonable practice" under § 17 to assess stevedores to the extent of 50% of the cost of the shipping gallery,[12] 100% of the costs of the grain dock and wharf, $50 per vessel for dock clean-up, and $25,000 per year for liaison service, because these charges do not reasonably relate to services now rendered to the stevedore based on actual use. The Commission reasons that to the extent benefits of increased efficiency are conferred by the grain terminal beyond actual use by stevedores, the attendant costs are properly assessable against the immediate beneficiaries: the vessel, which can make more trips because of the vastly shortened loading time, and the shipper, who can have his grain loaded at greatly decreased cost per ton (J.A. 72).

Cargill says there is no evidence of such benefits to the vessel or shipper, and that the only testimony is that of its expert, Philip E. Linnekin. There are two answers to this: (1) The cross-examination of Linnekin brought out that he had not really made a quantitative determination of benefits to the stevedore, and that he was in a sense relying on his general experience and economic theory (J.A. 215–16). (2) The matter is one of judgment in determining benefits under the so-called Freas Formula, really an approach based on fairness and benefits.[13] The FMC has expertise and familiarity with the concepts, and so long as it gives its reasons and the basis of its approach, the FMC is not to be faulted because it did not put on an expert to make a recital of its approach in the form of testimony.

Here Cargill did not file a petition for reconsideration, or offer a witness to testify that the FMC's approach was unreasonable. While Cargill expert Linnekin testified as to how *he* would recommend an allocation, as a matter of his "judgment" (J.A. 364), he did not say that this was the only allocation permissible under pertinent principles of regulatory economics.

█ The court does have a supervisory role—to assure that the agency does not embark on a course that is arbitrary or capricious. We have no warrant for condemning the FMC's approach here as unreasonable or arbitrary. The ultimate questions involve judgment, and we cannot say that FMC's approach is without rationality, although were the decision ours we might slice the pie differently.

Admittedly Cargill finds little solace in being able to assess the shipper because

12. Cargill's expert first estimated that the stevedores should bear 75% of the cost of the gallery, then revised it to 50% (J.A. 34).

13. The Freas Formula, developed by Howard G. Freas in connection with *Terminal Rate Structure—California Ports,* 3 U.S.M.C. 57 (1948), involves a two-step determination of (1) total cost as divided by functional area, and (2) the appropriate revenue item from each benefiting user of the service or facility

to produce a compensating revenue for the marine terminal. As Cargill export Linnekin testified, "[i]t is important to note that while the method is called a 'formula,' it is not an immutable equation. Rather, it is a set of principles which when combined with the judgment of a trained analyst, provides a reasonable assessment of costs, and a fair and reasonable allocation of those costs." (J.A. 364).

Cargill is the shipper here.[14] However, the Commission can insist on a proper allocation among the benefited parties, disregarding the happenstance that a given party may occupy several roles. If the distribution of the benefit is such that the shipper is properly assessable where there is no relationship between the terminal operator and the shipper, the same allocation applies where they are one and the same. In any case, Cargill's dilemma is only in the short run, for if the ground rules are now clearly stated, it will be able to recoup the charges assessable against the shipper by getting more from the consignee in future transactions. At the oral argument, it was said that at Baton Rouge it is customary for the shippers to sell F.O.B. vessel (J.A. 163), placing the responsibility on the consignee to procure the vessel, but even if the documents are not phrased in that form the actual cost of the supplies on board the vessel is the dominant economic fact of life, which determines how much the consignees will pay the shippers for the grain itself.

The question of whether the Port's reservation of "dockage" precludes Cargill from charging "wharfage" to the vessel is not before us.[15] The FMC would permit charges associated with the shipping gallery allocable to the stevedore to be assessed as "wharfage" against the vessel (J.A. 73 & n. 29). We need not consider what the FMC would have done, and for what reasons, if it had been confronted with a case where the Port prevented the terminal operator from levying any charge on the vessel.

■ Cargill further claims that the Commission's order prevents any assessment against the stevedore until the ALJ on remand determines what constitutes a proper allocation to the stevedore. While the Commission's ruling lacks clarity, we do not read it to say Cargill cannot in the interim levy a charge against the stevedore for "actual use" of the grain terminal. The Commission's position at oral argument was that Cargill must follow the usual procedures under the Commission's General Order 15, 46 C.F.R. § 533.3, and file a tariff with charges based on an allocation consistent with its ruling. Here Cargill failed to file a tariff in the first instance, which the Commission found to be an independent violation of Section 17 (J.A. 75)—a ruling endorsed by all five members of FMC, and not appealed by Cargill. The Commission, far from preventing Cargill from charging Barma, specifically ordered Cargill to "file forthwith any and all charges and conditions within the limits authorized by this decision which Cargill intends to impose" *id.*

Cargill's failure to file a tariff does not, in some mysterious fashion, render improper the Commission disposition and remand. Picking upon the point raised by Commissioners Barrett and Morse in their partial dissent, Cargill urges that the Commission in effect has issued an interim injunction, a remedy it does not have under this court's ruling in *Trans-Pacific Freight Conference of Japan v. FMB,* 112 U.S.App.D.C. 290, 302 F.2d 875 (1962). In that case, however, Judge Washington held that the Commission was not authorized under § 15 to issue a

---

**14.** Cargill owns approximately 90 to 95 percent of the grain it handles at the Baton Rouge facility (J.A. 175–76).

**15.** The lease provides that "[n]othing herein shall be construed as prohibiting the Port from charging normal and competitive dockage fees chargeable to ships using the facilities; but wharfage fees chargeable against the grain shall not be charged" (J.A. 296). The lease thus precludes Cargill from charging "dockage," defined by both the Port's tariff and the Commission's regulations as a charge against the vessel for tieing up at a dock or wharf, *see* J.A. 301; 46 C.F.R. § 533.6(d)(1) (1974). But it is silent on whether Cargill may assess

"wharfage" against the vessel. The Commission defines "wharfage" as a charge "against the cargo or vessel on all cargo passing or conveyed over, onto, or under wharves . . . for [its] use of [the] wharf," *see* 46 C.F.R. § 533.6(d)(2). While the Port's tariff recognizes "wharfage" as a charge separate and distinct from "dockage" and based upon the movement of cargo over a facility rather than tieing up there, it defines the term as "a charge against cargo," see J.A. 301. Whether this definition precludes such a charge against the vessel should be addressed by the Commission.

restraining order *pendente lite* where the only justification advanced was a finding of irreparable injury and there was no finding of a violation of the Act. *Trans-Pacific Freight Conference* is inapposite here, where the Commission is acting under § 17 and has found a violation of that provision, and where charges cannot be levied forthwith in view of the terminal operator's failure to file a tariff. The Commission's course here seems clearly within its powers as outlined by Justice Frankfurter in *California v. United States,* 320 U.S. 577, 582, 64 S.Ct. 352, 354, 88 L.Ed. 322, 329 (1944). There Justice Frankfurter stated that on finding a violation of §§ 16 and 17, "the Commission was charged by law with the duty of devising appropriate means for their correction," which included issuance of "an order generally prohibiting further preferential and unreasonable practices, leaving the parties to translate such a generality into concreteness and to devise their own remedies." Thus, while under § 17 the Commission "may" prescribe a "reasonable practice" as a remedy for a § 17 violation, under the *California* decision it may declare the charges to be an "unreasonable practice" and leave to Cargill the option in the first instance of filing a tariff carrying charges consistent with § 17 and the FMC's ruling thereon.

At the oral argument there was some discussion of the consequences of Cargill's filing of a tariff for a 5-cents charge subsequent to the issuance of the FMC order under review. That is not a part of the record and case before us.

The Department of Justice (Antitrust Division) claims that the FMC went too far in the authorization of charges to Barma. The Department says that charges can only be based on (a) express contract with the persons charged; (b) a custom at the port, possibly on the theory that this gives rise to an implied contract; or (c) actual use, in which case there is either another kind of implied contract or a subjection to reasonable tariff regulation.[16] And the Department says that the benefits ascribed to use cannot be the kind of benefits inherently accruing to a stevedore whose employees never set foot on the dock, as an "incidental beneficiary." In rebuttal, FMC counsel puts it that even a stevedore whose employees row to the vessel use the dock when they attach to the spout on the dock.

Barma sought review only on the ground that Cargill's charges violated §§ 15 and 16.[17] Cargill opposed the FMC's authority under § 17 to limit its charges against stevedores. There was no appeal to this court by anyone on the ground that, assuming §§ 15 and 16 to be inapplicable, the FMC contravened § 17 because it did not place sufficient limits on what might be charged to a stevedore. The approach of the Antitrust Division was neither presented to the FMC, nor made the subject of a petition to review. We have no jurisdiction to rule on its merits.

*Affirmed.*

---

**16.** The Justice Department agrees with the Commission's determination as to Cargill's allocations to the stevedore for the shipping gallery and dock clean-up and liaison service, although for different reasons. As to the wharf and utility allocations, it would expressly condition the charge on actual use by the stevedore; as to overhead, it would require a recalculation to reflect the reduction in other charges to the stevedore resulting from the Commission's decision. Brief for the United States of America at 12.

**17.** Whatever contention Barma may have previously made that *any* charges against the stevedore would constitute an "unreasonable practice" under § 17 was abandoned in this appeal. Indeed, Barma filed a brief as intervenor in No. 75–1018, involving Cargill's petition for review, endorsing the Commission's application of § 17.